# EXHIBIT B

FILED IN MY OFFICE
DISTRICT COURT CLERK
12/19/2017 2:32:49 PM
STEPHEN T. PACHECO
Rachel Morse

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

BURRELL DIVERSIFIED                    §
INVESTMENTS, LLC and BURRELL           §
WESTERN RESOURCES, LLC,                §
                                       §
        Plaintiffs,                    §        No. D-101-CV-2017-03502
                                       §
v.                                     §
                                       §        Case assigned to Ortiz, Raymond Z.
TETRA TECH, INC.,                      §
                                       §
        Defendant.                     §

## COMPLAINT

Plaintiffs Burrell Diversified Investments, LLC ("BDI") and Burrell Western Resources, LLC ("BWR") (collectively, "Burrell" or "Plaintiffs") file this Complaint against Defendant Tetra Tech, Inc. ("Tetra Tech" or "Defendant"), and would show the Court as follows:

I.

## PRELIMINARY STATEMENT

1.    This action arises out of Tetra Tech's wrongful actions relating to technical consulting work it agreed to provide Burrell with respect to a substantial deposit of industrial-grade garnet discovered within the Orogrande Mining District of the Jarilla Mountains, Otero County, New Mexico ("Orogrande").  Burrell engaged Tetra Tech to conduct phased due diligence regarding the Orogrande garnet deposit based on Tetra Tech's assurances that it had the capability and experience necessary to deliver a thorough feasibility study so Burrell could make well-informed decisions regarding the opportunity to develop the Orogrande deposit.  As it turned out, not only did Tetra Tech misrepresent its experience, it made no effort to deliver the investment-grade feasibility study it had promised to Burrell.  Then, in an effort to cover its tracks, Tetra Tech misrepresented what it had done.

## Exhibit B

2.      Unfortunately, due to significant mistakes and omissions in its findings and recommendations, Tetra Tech's analysis – which, importantly, was not the feasibility study that was contracted for -- was unreliable.  Worse still, given Tetra Tech's cover-up, Burrell did not discover the truth about Tetra Tech until it was too late.  As a result, Burrell paid Tetra Tech approximately $2.2 million for work product that was practically useless and not what was promised, and incurred substantial costs in reliance on Tetra Tech's analysis and advice.

3.      Notwithstanding its lack of expertise, competence, and truthfulness with respect to the Orogrande project, Tetra Tech has refused to own up to its misconduct and remedy the substantial harm it has caused to Burrell.  Accordingly, by this action, Burrell seeks to hold Tetra Tech accountable for its wrongdoing.

II.

**PARTIES**

4.      Plaintiff BDI is a Delaware limited liability company authorized to do business in New Mexico, with its principal place of business located in Santa Fe County, New Mexico.

5.      Plaintiff BWR is a Delaware limited liability company authorized to do business in New Mexico, with its principal place of business located in Santa Fe County, New Mexico.

6.      Defendant Tetra Tech is a Delaware corporation authorized to do business in New Mexico, with its principal place of business located in Los Angeles County, California.  Tetra Tech holds itself out as a global provider of professional consulting and engineering services, with more than 16,000 employees and 400 offices worldwide, including an office in Albuquerque, New Mexico.  Tetra Tech may be served with process via its registered agent, CT Corporation System, at 206 S. Coronado Ave., Espanola, NM 87532.

2

### III.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction in this matter.  N.M. Const., Art. VI, § 13.

8.      Venue is proper in this Court pursuant to NMSA 1978, § 38-3-1(F) (1988) because Tetra Tech's registered agent resides in Santa Fe, New Mexico.

### IV.

### RELEVANT FACTS

A.      **The Industrial Garnet Market.**

9.      Garnet is the general name given to a group of complex silicate minerals with similar properties and chemical compositions.  While gemstone-quality garnet is popular and used in jewelry, industrial-grade garnet is sought for its wide-ranging utility as an abrasive that is used in many industrial applications, such as heavy-duty cleaning, water jet cutting, and air or sand blasting.   The oil and gas drilling industry is one of the leading garnet-consuming industries, but industrial garnet is also consumed by aircraft and motor vehicle manufacturers, shipbuilders, ceramics and glass producers, electronic component manufacturers, and glass polishing, textile stonewashing, and wood furniture-finishing operations.

10.     Despite consuming approximately 15% of industrial garnet produced worldwide, U.S. industrial garnet production accounts for only 3% of global production.  Thus, most industrial garnet consumed in the U.S. is imported from other countries, primarily Australia, India, and China, as foreign imports have largely displaced U.S. domestic production over the past few decades.[1]  In fact, only four U.S. companies – located in Idaho, Montana, and New York – currently account for *all* production of industrial-grade garnet in the United States.

---

[1] Over the past 7 years, industrial garnet imports have provided between 69% and 82% of the total U.S. industrial garnet supply.

**B.** **Burrell Begins Diligence On The Opportunity To Acquire And Develop A Garnet Deposit Discovered In Orogrande, New Mexico.**

11.    Although the Orogrande area has been mined since the late 1800s, the historical mining activity at the site has produced mostly gold, iron, copper, and lead. In the mid-1990s, however, a preliminary resource survey revealed the presence of a significant deposit of garnet at Orogrande.

12.    The existence of a large garnet deposit does not necessarily mean that a site can support profitable mining operations. Garnet occurs worldwide in many rock types, but relatively few commercially viable deposits of industrial-grade garnet have been identified. The value and viability of an industrial garnet deposit depends largely on the size and grade of the reserves, the type and quality of garnet mined, the proximity of deposits to infrastructure and consumers, and the milling costs. Indeed, simply determining the commercial potential of a garnet deposit requires substantial up-front investment of time, money, and resources – in addition to the tens of millions of dollars required to establish and maintain a mining and processing operation, which may take many years to become profitable.

13.    Against that background, it is not surprising that it took decades before significant progress was made toward assessing the commercial viability of the Orogrande garnet deposit. In fact, it was not until 2013 that the feasibility of a garnet mining operation in Orogrande became the subject of serious diligence efforts. Around that time, Dan Burrell, a New Mexico businessman, learned of the Orogrande garnet deposit. As Mr. Burrell came to understand, the Orogrande deposit appeared to have a number of potential advantages with respect to size of the deposit, concentration and location of garnet within the deposit, and proximity of the site to infrastructure and consumers. And, given the relative scarcity of producers in the U.S., a new

4

domestic supply of industrial garnet, competitively priced, could be very profitable – as well as promote significant job creation and economic growth in the Orogrande area.

14.     Intrigued by the potential of a garnet mining and processing operation in Orogrande, Mr. Burrell formed BDI and BWR to explore the opportunity to acquire and develop the Orogrande garnet deposit (the "Project"). Plaintiffs knew that the Orogrande Project would require steep up-front costs and, if successful, would still take years to become profitable. Accordingly, prior to making any significant investment decisions, Burrell needed to carefully evaluate the commercial viability of the Orogrande garnet deposit. Thus, Plaintiffs set out to find a consulting firm with the capabilities and relevant experience needed to conduct appropriate diligence regarding the Orogrande Project. That search led Burrell to Tetra Tech.

**C.     Based On Tetra Tech's Representations About Its Team's Capabilities And Experience, Burrell Engages Tetra Tech On The Orogrande Project.**

15.     Tetra Tech holds itself out as "a leading provider of consulting, engineering, program management, construction management, and technical services." According to its website, Tetra Tech provides mining, geological, metallurgical, environmental, engineering, and consulting services to assist mining and mineral exploration companies. Tetra Tech also offers "mineral industry consulting for the early-stage scoping, preliminary economic assessment, pre-feasibility, and feasibility stages for new projects." Tetra Tech boasts that its "Mining & Minerals" group "is experienced in both open-cut and underground mining methods for a broad range of commodities, including gold, silver, copper, platinum, lithium, clay, potash, phosphate, silica sands, garnet, coal, oil sands, iron ore, diamonds, and uranium." (Emphasis added.)

16.     When initially approaching Tetra Tech about the Project in or around April 2013, Burrell emphasized it·was looking for consultants with the technical expertise necessary to conduct sophisticated diligence regarding the Orogrande garnet deposit. Tetra Tech assured

5

Burrell that it had and, if hired for the Project, would utilize a team of qualified professionals with a wealth of relevant experience who were more than capable of handling the work.

17.    At no time did Tetra Tech disclose to Burrell that, contrary to its assurances, its team lacked experience working with industrial garnet or comparable minerals.  To the contrary, Tetra Tech repeatedly represented and emphasized that the Tetra Tech professionals working on the Project possessed the necessary skills and relevant experience to provide the required services.

18.    Those representations were material to Burrell's decision to engage Tetra Tech, beginning in April 2013, to provide professional services for a phased due diligence study in support of investment decisions concerning the Orogrande garnet deposit.  Pursuant to the "Standard of Care" provision of the parties' agreement, Tetra Tech agreed that it would provide the requested professional consulting services "in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants performing comparable services under comparable circumstances."   Importantly, as Tetra Tech expressly acknowledged in undertaking to provide these services, its work was intended to assist Burrell and provide "an appropriate level of confidence" to make major investment decisions for the Project.

**D.    In Reliance On Tetra Tech's Promises, Analysis, And Advice, Burrell Invests Millions Of Dollars Into The Orogrande Project.**

19.    Pursuant to the parties' contract and a series of separately-executed proposals and work orders, Tetra Tech undertook to provide technical diligence and consulting services for the Orogrande Project in three general phases.  First, in the "resource exploration" phase, Tetra Tech was to evaluate historical data to classify the resource potential of the Orogrande garnet deposit. Second, in the "resource confirmation and exploratory drilling" phase, Tetra Tech was to conduct resource confirmatory drilling to test and validate the historical data regarding the

Orogrande deposit.  Finally, in the "feasibility level" phase, Tetra Tech was to complete and issue an "NI 43-101 compliant Feasibility Study."[2]

20.     The ultimate goal of Tetra Tech's work, including issuance of an NI 43-101 compliant feasibility study, was to assist Burrell in considering and deciding whether and how to proceed with the Orogrande Project.  Without technical analysis and professional advice about the commercial viability of the Orogrande garnet deposit, including the anticipated costs, productivity, and profitability of the contemplated mining operation, Burrell would not have moved forward with the Project.  Indeed, Burrell relied on Tetra Tech to ensure that investment decisions for the Orogrande Project were well-informed and based on all reasonably-available scientific and technical information.

21.     In reliance upon Tetra Tech's representations, conclusions, and recommendations throughout 2013 and 2014 -- which were ultimately incorporated into Tetra Tech's final comprehensive report, issued on December 19, 2014 -- Burrell made significant decisions regarding, and investment of money, time, and resources into, the Orogrande Project.  Indeed, in addition to paying Tetra Tech more than $2 million for its work on the Project, Burrell incurred substantial Project-related costs based on Tetra Tech's advice, including costs associated with obtaining permitting for the anticipated mining operation, pursuing financing and capital investment for the project, and proceeding with other necessary work.

---

[2] NI 43-101, short for National Instrument 43-101 Standards of Disclosure for Mineral Projects, is a standard established by the Canadian Institute of Mining, Metallurgy and Petroleum for the public disclosure of scientific and technical information related to mineral properties and projects.  The objective of NI 43-101 is to ensure that disclosures relating to minerals are founded upon reliable information, reflect professional opinions based on industry best practices and using standardized terms, and are understandable to a reasonably-informed investor.

E.     **Tetra Tech Fails To Deliver What It Promised – And Then Tries To Conceal The Truth From Burrell.**

22.     As referenced above, Tetra Tech's work on the Project was to culminate with its completion and issuance of an investment-grade "feasibility study." To that end, the feasibility level scope of work, memorialized in a "Work Authorization" executed in November 2013, called for Tetra Tech, "in accordance with the standard care and professional standards of [its] industry," to provide the following "deliverables" to Burrell:

---

### AREA 6:  Deliverables

- NI43-101 compliant resource.
- Phased and ultimate mine pit designs.
- Process design criteria and material balance.
- Feasibility level process design and layout.
- Complete metallurgical testwork report and analysis.
- Technical economic model.
- Feasibility study with NI43-101 compliant technical report.

---

Figure 1:  Excerpt from Work Authorization No. 05 dated November 25, 2013

23.     For more than a year, Burrell waited as Tetra Tech conducted the work supposedly needed for the feasibility study. Then, on December 19, 2014, Tetra Tech issued its final report for the Orogrande Project, *i.e.*, its "NI 43-101 Technical Report Preliminary Feasibility Study" with an effective date of December 1, 2014 (the "Report"), which Tetra Tech certified "was prepared to conform to the Canadian National Instrument 43-101 (NI 43-101) technical report requirements."

24.     In the Report, Tetra Tech set forth its conclusion that the relevant scientific and technical information, including additional data obtained from drilling and metallurgical

testwork conducted by Tetra Tech in 2013 and 2014, supported the feasibility of a garnet mining and processing operation for the Orogrande garnet deposit producing approximately 100,000 tons of salable product per year.[3]   The Report included, among other things:  (i) Tetra Tech's findings with respect to the proven and probable reserves of garnet, metallurgical testing, and mineral recovery and processing; (ii) process flow diagrams (also called "flowsheets") depicting the garnet recovery and processing method recommended by Tetra Tech for the contemplated processing plant; (iii) estimates of anticipated capital and operating costs for, and an economic analysis of, the Orogrande Project (which, according to Tetra Tech, had a "level of accuracy" of +/– 25%); and (iv) Tetra Tech's interpretations, conclusions, and recommendations.[4]   At bottom, based on its findings, Tetra Tech recommended that Burrell move forward with the Orogrande Project, in conjunction with completing certain additional work.

25.     The Report, however, was not nearly as thorough or clear as Burrell expected. Worried that the Report did not provide sufficient information to enable Plaintiffs to move forward and implement Tetra Tech's recommendations and design, Burrell asked Tetra Tech to provide further information and expressed concern about apparent errors in Tetra Tech's analysis.

26.     In response to Burrell's questioning of the Report, Tetra Tech "doubled down" on the purported accuracy and completeness of its analysis.  Specifically, by letter from D. Erik Spiller, Vice President and Principal Metallurgist for Tetra Tech, dated March 6, 2015, Tetra

---

[3] By comparison, the U.S. government estimated that domestic production of refined industrial garnet in 2016 totaled approximately 38,000 tons (*i.e.*, roughly one-third of what the Orogrande garnet deposit could supposedly produce on a yearly basis).

[4] The Report also included an appendix containing laboratory results from testing by DCM Science Laboratory and North Carolina State University Mineral Research Laboratory. However, Tetra Tech did not provide a complete metallurgical report.

Tech represented to Burrell that its approach was "in line with feasibility study requirements" and further characterized its Report as a "Class 3 Estimate" under the classification system utilized by AACE International (formerly known as the Association for the Advancement of Cost Engineering) for mining and mineral processing industries.  To drive home Tetra Tech's claim that its Report fulfilled its contractual obligations for the feasibility phase of the Project, the March 6 letter reproduced the following description of "Class 3" studies from AACE's "Recommended Practice" materials:

| CLASS 3 ESTIMATE | |
|---|---|
| **Description:**<br>A Class 3 estimate is prepared using probable or proven ore reserves as defined within acceptable confidence limits as per the securities codes. A detailed mine plan is required (pre-stripping may begin upon project approval). Metallurgical test work is sufficient to expand the detail in equipment lists and specifications. Engineering is expected to provide general arrangement drawings (GAs), preliminary piping and instrument diagrams (P&ID's) and single line electrical drawings.  Also, plot plans and layout drawings are better defined.<br><br>**Degree of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: Piping and Instrumentation diagrams (P&IDs) issued for design for plant and detailed mine plan for the mine.<br>10% to 40% of full project definition.<br><br>**End Usage:**<br>Class 3 estimates are typically prepared to support full project funding requests for internal and/or external investment. By default, the Class 3 estimate is the initial baseline for project and change control until superseded by the updated project control estimate (Class 2). | **Estimating Methods Used:**<br>Class 3 estimates are generally based on detail take-offs and estimates for significant cost items for direct and indirect costs where detailing can be done (e.g., pipe fittings not detailed). Major equipment and contracts are priced based on supplier quotations. Construction (bulks, labor and equipment) are estimated based on local pricing and trade agreements covering the available quantity take-offs. Mass earthwork and infrastructure such as transport pipelines and power transmission lines are based on take-off from preliminary contours and routing. Less significant costs may be factored such as small bore pipe as a % of large bore.<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 3 estimates are -10% to -20% on the low side, and +10% to +30% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information, and other risks (after inclusion of an appropriate contingency determination). The uncertainty varies by work type with moderate ranges applying to structures and plant commodities, wider ranges applying to earthworks and infrastructure and narrower ranges applying to equipment installation.<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Feasibility estimate (per NI 43-101), bankable feasibility estimate, final feasibility estimate, initial budget (or baseline) estimate, forced detail estimate, design basis memorandum (DBM). |

Figure 2:  Excerpt from Letter dated March 6, 2015

Moreover, according to Tetra Tech's letter, its "design of the Orogrande process plant represents about 30 percent engineering completion," and upon further review given Burrell's questions, Tetra Tech had "found no identified errors in the [Report]."

27.     Tetra Tech's representations about the quality of its Report, however, were false. Fundamentally, the Report lacked the in-depth level of detail and supporting documentation required for a feasibility study or Class 3 estimate. Instead, the Report was replete with errors and the use of generalizations and assumptions that failed to adequately support Tetra Tech's conclusions. In addition, Tetra Tech's final work product utterly failed to meet the accuracy and design completion levels characteristic of a Class 3 estimate. Put simply, the Report fell far short of what was promised and required.

28.     What's worse, Tetra Tech *knew* that it had not delivered the NI 43-101 compliant feasibility study it had promised. In fact, as Burrell later learned, Tetra Tech's mischaracterization of its Report as a "Class 3 Estimate" and "feasibility study" was deliberately deceptive. For example, despite excerpting the above chart from the AACE publication describing "Class 3" estimates, Tetra Tech's March 6 letter <u>omitted</u> the following excerpt from that same AACE publication:

> It is important to highlight the NI 43-101 terminology (defined by CIM[[4]]) relative to economic studies because these are often used as *de-facto* capital cost estimate categories in lieu of more defined estimate classifications such as this RP. NI 43-101 includes the following definitions for study types:
>
> - feasibility study - means a comprehensive study of a mineral deposit in which all geological, engineering, legal, operating, economic, social, environmental and other relevant factors are considered in sufficient detail that it could reasonably serve as the basis for a final decision by a financial institution to finance the development of the deposit for mineral production.
> - preliminary feasibility study and pre-feasibility study - each mean a comprehensive study of the viability of a mineral project that has advanced to a stage where the mining method, in the case of underground mining, or the pit configuration, in the case of an open pit, has been established and an effective method of mineral processing has been determined, and includes a financial analysis based on reasonable assumptions of technical, engineering, legal, operating, economic, social, and environmental factors and the evaluation of other relevant factors which are sufficient for a qualified person, acting reasonably, to determine if all or part of the mineral resource may be classified as a mineral reserve.
>
> The primary distinction between the above is that the feasibility study is a suitable basis for a final decision. This RP recommends that a best industry practice to manage investment risk is to equate mining feasibility study capital cost estimates as AACE Class 3 (basis for full funding) and preliminary and pre-feasibility study estimates as AACE Class 4.

<u>Figure 3</u>:  Excerpt from AACE Recommended Practice 47R-11

29.     In other words, a "feasibility study" – which is what Burrell paid for and what Tetra Tech claimed to have provided – is a "Class 3" level estimate that is a suitable basis for final project investment and financing decisions, as opposed to a "preliminary feasibility study" or "pre-feasibility study" that only qualifies as a "Class 4" estimate.  As another chart from the AACE Recommended Practice materials reflects, the differences between "Class 3" feasibility-level estimates and "Class 4" pre-feasibility estimates are material:

| ESTIMATE CLASS | Primary Characteristic | Secondary Characteristic | | |
|---|---|---|---|---|
| | MATURITY LEVEL OF PROJECT DEFINITION DELIVERABLES Expressed as % of complete definition | END USAGE Typical purpose of estimate | METHODOLOGY Typical estimating method | EXPECTED ACCURACY RANGE Typical variation in low (L), and high (H) ranges [b] |
| Class 5 | 0% to 2% | Conceptual planning | Capacity factored, parametric models, judgment, or analogy | L:  -20% to -50%<br>H:  +30% to +100% |
| Class 4 | 1% to 15% | Screening options | Equipment factored or parametric models | L:  -15% to -30%<br>H:  +20% to +50% |
| Class 3 | 10% to 40% | Funding authorization | Semi-detailed unit costs with assembly level line items | L:  -10% to -20%<br>H:  +10% to +30% |
| Class 2 | 30% to 75% | Project control | Detailed unit cost with forced detailed take-off | L:  -5% to -15%<br>H:  +5% to +20% |
| Class 1 | 65% to 100% | Fixed price bid check estimate | Detailed unit cost with detailed take-off | L:  -3% to -10%<br>H:  +3% to +15% |

Figure 4:  Excerpt from AACE Recommended Practice 47R-11

30.     Burrell asked and paid for a feasibility (Class 3) study, and that is what Tetra Tech contracted to provide and claimed to have provided by issuance of the Report.  Yet, in communications with potential vendors mere weeks before the issuance of the Report, Tetra Tech personnel referred to their work as "PFS [pre-feasbility study] level at most."  Thus, not only did Tetra Tech know that its work did not rise to the level required for a feasibility study or Class 3 estimate, it did not even make a good faith attempt to provide that required deliverable.

Instead, in what can only be described as a deliberate effort to mislead its client, Tetra Tech mischaracterized its Report in order to conceal its wrongdoing from Burrell.

**F.    Burrell Discovers That Tetra Tech Was Untruthful, Incompetent, And Had Essentially Wasted Burrell's Money.**

31.    Unfortunately, Tetra Tech also misrepresented its team's capabilities, qualifications, and relevant experience.  Contrary to Tetra Tech's boasts of its knowledge and expertise working on comparable minerals and mining operations, the personnel utilized by Tetra Tech for the Orogrande Project had zero experience with garnet or similar industrial minerals.[5] As Tetra Tech knew or should have known, its team's experience with metals and other commodities did not qualify as "comparable" to the work needed for diligence on the Orogrande garnet deposit.  Given its lack of relevant experience, Tetra Tech should have told Burrell at the outset that it was not the right firm for the Project and turned down the job.  It did not do so and, instead, misled its client into believing the Tetra Tech team was qualified to perform the analysis it was paid handsomely to perform.

32.    Predictably, Tetra Tech's remarkable lack of expertise for this project led it to make numerous mistakes and costly errors that infected its entire analysis.  For example, a crucial part of Tetra Tech's job was to arrange, monitor, and document laboratory work conducted for the Project.  Tetra Tech, however, was incompetent when it came to metallurgical testwork that was critical to determining the commercial viability of the Orogrande garnet deposit.  For this Project in particular, it was necessary to ascertain whether and how garnet from the Orogrande site could be processed reasonably and consistently to a refined product that

_____

[5] To be a "Qualified Person" ("QP") competent to author and issue an NI 43-101 compliant report, an engineer or geoscientist must, among other things, have "experience relevant to the subject matter of the mineral project and the technical report."  Thus, the individual consultants held out by Tetra Tech as QPs in the contract documents and the Report failed to meet the necessary criteria with respect to the Orogrande garnet deposit.

contained less than 1.0% free silica.[6] Tetra Tech arranged and oversaw the metallurgical testing for this purpose,[7] at significant cost to Burrell.  Regrettably, Tetra Tech completely botched that metallurgical testwork, which rendered its resulting conclusions and recommendations unreliable.

33.     Most critically, Tetra Tech made no effort to appropriately document the metallurgical testing, including the methodology used by the laboratories, despite the contractual requirement that it deliver a comprehensive metallurgical report to Burrell.   Thorough documentation of such testing is not only a standard practice, but is also necessary in order to be able to recreate and confirm laboratory results.  Without such documentation, Tetra Tech's results were unverifiable and unreliable.  Even worse, the limited documentation of the metallurgical testing overseen by Tetra Tech indicated that the testwork was materially flawed in several respects.  For instance, the only <1.0% free silica results achieved by Tetra Tech came from tests of unreliable "sack inventory" samples collected years earlier that were not suitable for such testing (at least without the use of confirming samples).  Put simply, the metallurgical testwork organized and monitored by Tetra Tech was substandard and wholly inadequate to support reasonable investment decisions.

34.     Tetra Tech's lack of garnet-related experience had a disastrous compounding effect.  Indicative of its lack of relevant expertise, Tetra Tech's team inappropriately relied upon

---

[6] U.S. government specifications require that products used for blasting abrasives, such as industrial garnet, contain less than 1.0% free silica.  Accordingly, in order to determine the commercial viability of the Orogrande garnet deposit and the design of a processing facility, Tetra Tech needed to determine a method by which garnet extracted from the Orogrande mine could be processed reliably to produce a final product meeting the <1.0% free silica requirement.

[7] Tetra Tech utilized and supervised a number of outside laboratories in connection with the Orogrande Project, including RDi Laboratories, DCM Science Laboratory, and North Carolina State Mineral Research Laboratory.

metallurgical testwork results achieved using analytical equipment unsuitable for field use to determine a method by which Orogrande garnet could supposedly be processed to required free silica levels.  Based upon that faulty conclusion, Tetra Tech prepared flowsheets reflecting such a processing method and, based upon those flowsheets, purportedly selected and priced out equipment for the contemplated mining operation.  Those projected capital and operating costs, of course, were fundamental to Tetra Tech's economic model, which reflected Tetra Tech's ultimate conclusion about the commercial viability of the Orogrande garnet deposit.  Thus, Tetra Tech's lack of knowledge and expertise with respect to industrial garnet led it to make seriously-flawed assumptions that undercut the reliability of its economic analysis.

35.     Tetra Tech's economic model, however, suffered from other major defects.  A key input into the economic analysis was the capital and operating cost estimate developed by Tetra Tech.  Those costs were supposed to be estimated at a detailed level based on Tetra Tech's design and reasonably-available vendor pricing.  Yet, Tetra Tech largely failed to seek or obtain equipment pricing quotes from potential vendors or manufacturers.  Instead, it relied heavily on "factored" estimates that are inappropriate for a "Class 3" feasibility study.[8]  That imprecise approach, combined with Tetra Tech's lack of knowledge regarding appropriate equipment for such a garnet mining and processing operation, led to an economic analysis that was so inaccurate that it was useless.  Indeed, the economic analysis was off by more than 70% – a far cry from the ±25% accuracy level touted by Tetra Tech.

36.     In sum, the testing and conclusions that were at the heart of Tetra Tech's analysis regarding the commercial viability of the Orogrande garnet deposit were completely unreliable and seriously flawed.  Burrell, however, did not learn of Tetra Tech's inexperience and

---

[8] Notably, "Class 4" estimates consistent with a pre-feasibility study typically use such a factoring methodology to estimate project costs.  *See supra* Figure 4.

15

incompetence until it was too late.  It was not until Tetra Tech issued its grossly-inadequate Report and there were problems implementing Tetra Tech's recommendations that Burrell began to discover the truth — that Tetra Tech did not have the experience or qualifications it represented to secure the contract and that its work was unreliable.  At that point, Burrell was forced to engage a new technical team which, at great cost to Burrell, analyzed Tetra Tech's work and concluded that it was so deficient as to be basically worthless.

37.     Given the incomplete nature of Tetra Tech's Report and its failure to properly document its work, it took substantial time and money for Burrell's new technical team to fully assess Tetra Tech's conclusions.  That analysis, however, led Burrell to conclude, contrary to what Tetra Tech found, that the Orogrande Project is not a commercially viable garnet deposit. For example, the metallurgical testwork conducted by the new team revealed that:  (a) <1% free silica values could not be consistently achieved with the Orogrande garnet using the process proposed by Tetra Tech; and (b) the chemical properties of the Orogrande garnet made it generally unsuitable for commercialization (specifically, it was too soft and left stains when used in blasting applications), contrary to what Tetra Tech had reported.  In addition, the new team concluded that Tetra Tech's design and "footprint" of, and equipment selections for, the proposed garnet processing plant were inappropriate and unworkable (and undercut Tetra Tech's related conclusions relating to permitting, capital expenditures, and operating expenses).  As such, the Project was not economically viable.  Thus, not only was Tetra Tech's work incomplete and unreliable, but it came to the wrong ultimate conclusion.

G.     **The Damage Done**

38.     In reliance upon Tetra Tech's misrepresentations and negligent advice, Burrell incurred millions of dollars in costs in connection with the Orogrande Project, including more than $2 million in fees paid to Tetra Tech for its worthless work product.  In addition, Burrell has

been forced to spend additional millions of dollars to assess Tetra Tech's unreliable analysis and re-do the work Tetra Tech was hired (but failed) to do.  Moreover, the delay resulting from the need to scrap Tetra Tech's work and essentially start over has caused significant financial losses to Burrell.

39.    Regrettably, the millions of dollars in damages caused by Tetra Tech's negligence could have been avoided, had Tetra Tech simply been truthful with Burrell about its lack of relevant experience.  Instead, Tetra Tech was greedy, bit off more than it could chew, and then tried to conceal its gross incompetence by misleading its client – resulting in significant harm to Burrell.

40.    In light of the foregoing, Burrell now seeks to hold Tetra Tech responsible for the substantial damages caused by its wrongful actions.

## V.

## CLAIMS

A.    **Count One:  Breach Of Contract**

41.    The foregoing allegations are realleged and incorporated herein by reference.

42.    Burrell entered into an enforceable contract with Tetra Tech pursuant to the parties' Master Consulting Services Agreement dated April 26, 2013, as amended and supplemented (the "Agreement"), pursuant to which Tetra Tech agreed to perform certain consulting and technical services with respect to the Orogrande Project.  Under paragraph 1 of the "Terms and Conditions" of the Agreement, titled "Standard of Care," Tetra Tech agreed to perform those professional services "in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants performing comparable services under comparable circumstances at the time services are performed under this Agreement."  Similarly,

17

pursuant to Work Authorization No. 5, which became part of the Agreement on or about November 27, 2013, Tetra Tech agreed to conduct its "feasibility level" work for the Orogrande Project "in accordance with the standard care and professional standards of our industry." In addition, under that Work Authorization, Tetra Tech agreed to provide Burrell with, among other things, a "[f]easibility study with NI43-101 compliant technical report" and "[c]omplete metallurgical testwork report and analysis."

43.     Burrell performed under the Agreement and/or was excused from performance.

44.     Tetra Tech breached the above-identified provisions of the Agreement by failing to provide its services to Burrell on the Orogrande Project "in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants performing comparable services under comparable circumstances at the time" such services were performed. Instead, Tetra Tech performed at a level well below the standard care and professional standards of its industry. Tetra Tech also breached its contractual obligation to provide a "[f]easibility study with NI43-101 compliant technical report" and "[c]omplete metallurgical testwork report and analysis" for the Orogrande Project.

45.     Burrell has been damaged as a direct and proximate result of Tetra Tech's breaches of the Agreement. Accordingly, Burrell seeks, and is entitled to recover, actual, compensatory, and consequential damages.

**B.      Count Two: Negligence**

46.     The foregoing allegations are realleged and incorporated herein by reference.

47.     Tetra Tech owed Burrell a duty to apply the knowledge, care, and skill of reasonably well-qualified professionals practicing under similar circumstances.

48.    Tetra Tech breached its duty to Burrell by failing to apply the knowledge, care, and skill of a reasonably well-qualified consultant under similar circumstances in connection with its work on the Orogrande Project.

49.    Burrell has been damaged as a direct and proximate result of Tetra Tech's breach of its duty to apply the knowledge, care, and skill of a reasonably well-qualified consultant under similar circumstances.    Accordingly, Burrell seeks, and is entitled to recover, actual, compensatory, and consequential damages.

C.    **Count Three: Fraud**

50.    The foregoing allegations are realleged and incorporated herein by reference.

51.    Prior to Burrell engaging Tetra Tech to provide consulting and technical services for the Orogrande Project, Tetra Tech represented to Burrell that it had and would utilize a team of qualified professionals, with knowledge and experience on comparable projects, for the Project.  Moreover, Tetra Tech expressly made representations in the parties' Master Consulting Services Agreement and subsequent Work Authorizations that its team of professionals possessed the necessary skills and relevant experience to provide the services required for the Orogrande Project.  Those representations were false.

52.    In addition, pursuant to a proposal dated November 25, 2013, which was incorporated into the parties' Agreement by Work Authorization No. 5, Tetra Tech promised that it would prepare and provide Burrell with, among other things, a "feasibility study" in accordance with NI 43-101.  Tetra Tech subsequently represented, on numerous occasions throughout 2014 and 2015 that it would provide (and, in December 2014, had provided) an NI 43-101 compliant feasibility study.  Those representations were false.  Furthermore, when promising Burrell that it would prepare and provide an NI 43-101 compliant feasibility study for

the Orogrande Project, Tetra Tech did not intend to do so. Instead, on information and belief, Tetra Tech intended to only provide what was, at most, a "pre-feasibility" study.

53.     Tetra Tech made the above-identified misrepresentations intentionally or with reckless disregard for the truth. In fact, Tetra Tech was fully aware that its team did not have experience working on comparable projects and was not sufficiently qualified for the Orogrande Project. Moreover, as demonstrated by its communications with vendors in November 2014 (which were not disclosed to Burrell until March 2015), Tetra Tech did not provide an NI 43-101 compliant feasibility study, nor did it even attempt (or intend) to do so.

54.     Tetra Tech made the above-described misrepresentations with the intent to deceive and to induce Burrell to act upon the misrepresentations.

55.     Burrell actually and detrimentally relied upon Tetra Tech's misrepresentations. Indeed, based on and in reliance on those misrepresentations, Burrell engaged Tetra Tech and paid it more than $2 million to perform services that were later discovered to be worthless. Moreover, in reliance upon Tetra Tech's misrepresentations, Burrell expended significant monies moving forward with the Orogrande Project.

56.     Burrell has been damaged as a direct and proximate result of Tetra Tech's fraudulent misrepresentations. Accordingly, Burrell seeks, and is entitled to recover, actual, compensatory, consequential, and punitive damages.

## VI.

## <u>PRAYER</u>

WHEREFORE, for all of the foregoing reasons, Plaintiffs pray for judgment against Defendant awarding Plaintiffs the following relief:

    a.  Actual, compensatory, and consequential damages;

    b.  Punitive damages;

c.  Pre- and post-judgment interest at the maximum rate allowed by law;

d.  Costs of Court; and

e.  Such other and further relief which the Court deems just and proper.

Dated: December 18, 2017                  Respectfully submitted,

MONTGOMERY & ANDREWS, P.A.

By:   /s/ Stephen S. Hamilton
          Stephen S. Hamilton
          Matthew A. Zidovsky
P.O. Box 2307
Santa Fe, New Mexico 87504-2307
shamilton@montand.com
mzidovsky@montand.com
(505) 982-3873

and

*Of Counsel (to seek pro hac vice admission):*

Michael S. Gardner
Texas State Bar No. 24002122
michael@gardnerhaas.com
Jeremy D. Camp
Texas State Bar No. 24069459
jc@gardnerhaas.com
**GARDNER HAAS PLLC**
2828 Routh Street, Suite 660
Dallas, Texas 75201
Telephone: (214) 415-3473

**ATTORNEYS FOR PLAINTIFFS**

21